UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

       Plaintiff,

  vs.                      REPORT AND RECOMMENDATION

Lee Marvin Greenly,

       Defendant.        Crim. No. 06-235 (01)(PAM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Defendant's Motion to Suppress All Statements.

A Hearing on the Motions was conducted on September 12, 2006, at which time, the Defendant appeared personally, and by Robert G. Malone, Esq., and the Government appeared by Michael A. Dees, Assistant United States Attorney.

For reasons which follow, we recommend that the Defendant's Motion to Suppress All Statements be denied.

## II.  Factual Background

The Defendant has been charged with one Count of Lacey Act Conspiracy --
Bear Guiding in violation of Title 18 U.S.C. §371; one Count of Lacey Act -- Bear
Guiding in violation of Title 16 U.S.C. §§3371(a)(1), 3372(c)(1) and 3373(d)(1)(B);
and one Count of Lacey Act Conspiracy -- False Label in violation of Title 16 U.S.C.
§§3372(d)(2) and 3373(d)(3)(A)(ii), and Title 18 U.S.C. §371. The events which give
rise to these charges are alleged to have occurred on or about September of 2004, in
this State and District, and within the exterior boundaries of the Sandstone National
Wildlife Refuge ("Sandstone NWR"), in the State of Minnesota. As pertinent to those
charges, and to the Motion now before us, the operative facts may be briefly
summarized.[1]

At the Hearing, Bradly Merrill ("Merrill"), who is a Special Agent for the
United States Fish and Wildlife Service, Department of the Interior ("USFWS"),

---

[1]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion. Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require. See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

testified at the instance of the Government.  According to Merrill's testimony, law enforcement officers interviewed the Defendant on two (2) separate occasions concerning the events which underlie his pending charges, and the statements that the Defendant made during those Interviews are the subject of the Defendant's Motion.

On September 19, 2005, Merrill arrived at the Defendant's home, outside Sandstone NWR, at approximately 10:30 o'clock a.m.  Merrill testified that he was wearing plain clothes with an identifying badge on his belt, was driving an unmarked vehicle, and was wearing a weapon, which was initially concealed by the raincoat that he was wearing.  Merrill was not certain if his weapon would have been visible subsequently, when he removed his raincoat but, at no point, did he remove the weapon from its holster.  There were other people present on the Defendant's property that morning, although the only one Merrill could identify was Timothy Nelson ("Nelson").  The Defendant met Merrill at the door to the Defendant's home, and Merrill described the Defendant as being friendly and cooperative.  According to Merrill, the Defendant agreed to speak with him.  At the Defendant's suggestion, the men went into the Defendant's home office.  Once inside, Merrill explained the nature of his investigation, and asked the Defendant if he would answer a few questions, which the Defendant agreed to do.

The interview lasted approximately six (6) hours -- until 4:45 o'clock p.m.  The Defendant left his office on two occasions.  First, he went outside to speak with Nelson, at which time, Merrill went outside to stand on the Defendant's driveway, but he did not join in, or monitor, Merrill's discussion with Nelson.  On a second occasion, the Defendant left the office to prepare lunch for himself in his kitchen.  He invited Merrill to come with him into the kitchen, and Merrill did so.  Over the course of their conversation, the Defendant received several telephone calls, some of which he ignored, while others he answered.  The Defendant was polite throughout the interview.

After interviewing the Defendant for approximately an hour, at about 11:30 o'clock a.m., Merrill presented the Defendant with a Search Warrant for the Defendant's house, which had been obtained before Merrill entered the Defendant's property.  Merrill testified that he did not present the Search Warrant to the Defendant immediately upon Merrill's arrival since, in his experience, people sometimes became angry, and uncooperative, when confronted with a Warrant.  Notwithstanding the Search Warrant, the Defendant continued to be pleasant and cordial.  After Merrill served the Warrant, he called in agents, who were standing by, to enter the Defendant's property, and conduct the search.  Approximately five (5) or six (6)

agents engaged in the search of the Defendant's house, and remained on the property for slightly over seven (7) hours -- until 6:50 o'clock p.m. Also at 11:30 o'clock a.m., Merrill informed the Defendant that he was not under arrest, to which the Defendant responded by laughing and stating that he knew that he was not, and that he understood that Merrill was simply doing his job.

Merrill had brought a laptop and printer onto the Defendant's property. At the conclusion of the interview at 4:45 o'clock p.m., Merrill spent about twenty (20) or thirty (30) minutes typing the information, that the Defendant had shared with him, into an Affidavit, using a form already on his computer. At no point during the interview did Merrill advise the Defendant of his legal right to silence. See, Miranda v. Arizona, 384 U.S. 436 (1966). However, at the top of the form Affidavit Merrill used a written notice advising the Defendant of certain of his legal rights.[2] Merrill printed out a copy of the Affidavit for the Defendant to read over, and to alter if he wanted.

---

[2]The Affidavit form reads as follows: "I have been advised of and understand my right under the Constitution of the United States to refuse to be a witness against myself, and that any statement I may make may be used against me." Government Exhibit 1. Further, at the end of the form, which was signed by the Defendant, the statement provides that "no threats or promises have been made to obtain this statement."

The Defendant read the printed Affidavit, and Merrill testified that he recalled the Defendant making two changes.  First, the Defendant wanted to amend the Affidavit to specify that he maintained traps "on and around the Sandstone NWR," rather than just "on" the Sandstone NWR; and second, he added language clarifying that, while his co-Defendant, Troy Lee Gentry, had hunted on and around the Sandstone NWR primarily for coyotes, the Defendant assumed that, "if a buck deer was located, Troy Gentry may have tried to harvest it."  Government Exhibit 1. Merrill then tore up the unsigned printed statement, made the changes requested by the Defendant on his laptop computer, and printed out a final version of the Affidavit. See, Government Exhibit 1.  The Defendant signed the revised copy, which he subsequently photocopied for his own files on equipment in his home office.

At the conclusion of the interview at 4:45 o'clock p.m., the Defendant left the room, and went to join his wife and daughter on the front porch of their home, while the agents completed their search of his house.  At no point did Merrill, or any other Agent, tell the Defendant that he was not free to leave his property, although the Defendant was told that if he chose to stay on his property, he should remain on the porch so that the officers could conduct the search without interference.  The Defendant was not placed under arrest at the end of the interview and, at no point

during the interview, was his freedom of movement restrained.  Merrill did not advise the Defendant of his <u>Miranda</u> rights, see <u>Miranda v. Arizona</u>, supra, and the Defendant did not ask if he could consult with an attorney.

Merrill interviewed the Defendant a second time on December 8, 2005.  Merrill testified that he drove to the Defendant's house at 1:20 o'clock p.m., after observing the Defendant in Sandstone, and following his vehicle to his home.  As he pulled into the driveway, the Defendant also pulled in, driving a pick-up truck with two other passengers inside.  Once again, Merrill was driving an unmarked vehicle, and was dressed in plain clothes.  He was armed, but his weapon was not displayed to the Defendant during the interview.  The Defendant agreed to talk with Merrill, and invited him inside his home -- once again, into his office. Merrill told the Defendant that he was concerned that some of the answers, that the Defendant provided in their last exchange on September 19, 2005, had been less than honest, and Merrill wanted to give the Defendant a chance to change his story.

The second interview lasted for a half an hour.  During the course of that interview, they discussed statements that the Defendant had made in the previous questioning concerning Nelson's and Gentry's actions, and Merrill related a story about a boy, in Illinois, who had killed a bear.  The Defendant admitted that he had

not previously told the entire truth about the bear that was killed by Gentry.  At that point, the Defendant told Merrill that he had seen an attorney, who was aware of the investigation, and had advised him not to answer any questions.  Merrill testified that this was the first mention of legal counsel by the Defendant, and that he stopped asking questions at that point, and went outside to see if he could interview Nelson. Nelson told him that he did not wish to speak with him, so Merrill left the Defendant's property.  As related by Merrill, the Defendant was cordial and polite throughout the interview.  Merrill did not read the Defendant his <u>Miranda</u> rights at any point during the second interview, and the Defendant was not arrested at the conclusion of that questioning.

## III.  <u>Discussion</u>

<u>The Defendant's Motion to Suppress Statements</u>.

      1.     <u>Standard of Review</u>.  Government agents are not required to administer Miranda warnings to everyone they question.  See, <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977).  Rather, <u>Miranda</u> warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994), quoting <u>Miranda v. Arizona</u>, supra at 444; <u>United States v. Helmel</u>, 769 F.2d 1306,

1320 (8th Cir. 1985); Berkemer v. McCarty, 468 U.S. 420, 428-29 (1984). Once a

suspect is in police custody and subject to interrogation, the suspect must be informed

of his constitutional right to remain silent, and to be represented by legal counsel

during questioning. See, Miranda v. Arizona, supra at 473; see also, Dormire v.

Wilkinson, 249 F.3d 801, 804 (8th Cir. 2001).

"In determining whether an individual was in custody, a court must examine all

of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply

whether there [was] a formal arrest or restraint on freedom of movement of the degree

associated with a formal arrest." Stansbury v. California, supra at 322, quoting

California v. Beheler, 463 U.S. 1121, 1125 (1983). A list of common indicia of

custody, that has been identified by our Court of Appeals, includes the following:

> (1) whether the suspect was informed at the time of
> questioning that the questioning was voluntary, that the
> suspect was free to leave or request the officers to do so, or
> that the suspect was not considered under arrest; (2)
> whether the suspect possessed unrestrained freedom of
> movement during questioning; (3) whether the suspect
> initiated contact with authorities or voluntarily acquiesced
> to official requests to respond to questions; (4) whether
> strong arm tactics or deceptive stratagems were employed
> during questioning; (5) whether the atmosphere of the
> questioning was police dominated; or (6) whether the
> suspect was placed under arrest at the termination of the
> questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir 1990); see, United States v. Ollie, 442 F.3d 1135, 1137 (8th Cir. 2006); United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), cert. denied 544 U.S. 1060 (2005); United States v. Axsom, 289 F.3d 496, 500, 501 (8th Cir. 2002).

However, these factors "are by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to custody against those which detract." United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005), citing United States v. Czichray, supra at 827. Instead, the Griffin factors serve as a guide to the resolution of the ultimate inquiry of "whether the defendant was restrained as though he were under formal arrest." See, United States v. Czichray, supra at 827.

Whether or not Miranda is implicated, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination. See, Dickerson v. United States, 530 U.S. 428, 433-34 (2000). For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." Dickerson v. United States, supra at 434, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

As the Supreme Court has recently explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation."

- 10 -

[Schneckloth v. Bustamonte, 412 U.S. at 226.]  See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945) ("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant").   The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Stein v. New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507 U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly, 479 U.S. 157, 167 (1986); the length of the interrogation, see, Ashcraft v. Tennessee, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, supra at 441; and the continuous nature of the interrogation, see, Leyra v. Denno, 347 U.S. 556, 561 (1954).  See also, Withrow v. Williams, supra at 693 (listing the applicable considerations).  However, "[w]e cannot find that a statement was involuntary unless it is established that law enforcement officials engaged in coercive activity."  United States v. Bordeaux, 400 F.3d 548, 560 (8th Cir. 2005).

2.   <u>Legal Analysis</u>.  The Defendant has challenged the admissibility of the statements, that he made during his initial interview on September 19, 2005, as well as during his subsequent Interview on December 8, 2005.   We address the circumstances of each of the Defendant's interviews, in turn.  Since the Government concedes that Merrill never provided the Defendant with a <u>Miranda</u> advisory, in either interview, the critical determination is whether the Defendant was "in custody" during his two (2) instances of questioning by Merrill.  We find that he was not.

a.   <u>The Interview of September 19, 2005</u>.  As we have noted, the interview of September 19, 2005, was conducted by Merrill, alone, in the confines of the Defendant's own home.  As our Court of Appeals has recognized, "while a person may be deemed to be in custody even in his own home, e.g., Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), such is not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." <u>United States v. Helmel</u>, 769 F.2d 1306, 1320 (8th Cir. 1985); <u>United States v. Wolk</u>, 337 F.3d 997, 1007 (8th Cir. 2003); <u>United States v. Czichray</u>, supra at 826 ("When a person is questioned 'on his own turf,' United States v. Rorex, 737 F.2d 753,756 (8th Cir.1984), we have observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial

interrogation."), citing cases; <u>United States v. Axsom</u>, 289 F.3d 496, 502 (8th Cir. 2002)("When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial."), citing <u>United States v. Erving L.</u>, 147 F.3d 1240, 1247 (11th Cir. 1998), quoting 1 W. LaFave, <u>Criminal Procedure</u> §6.6(e), at 496 (1984 & Supp. 1991).   As well, Merrill informed the Defendant that he was not under arrest, to which the Defendant laughed, and acknowledged that no arrest had been made, and that Merrill was simply doing his job.  The Defendant was not restricted in any of his movements and, without objection from Merrill, he left the residence once to speak with an employee, and on a second occasion he invited Merrill into his kitchen while he prepared himself a lunch.

To be sure, during the course of the execution of the Search Warrant, the Defendant and other family members were advised to not interfere in the areas being searched, but they were not instructed to remain on the premises.  As the Supreme Court has expressly recognized, "[i]n Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), we held that officers executing a search warrant for contraband have the authority 'to detain the occupants of the premises while a proper search is conducted.'" <u>Muehler v. Mena</u>, 544 U.S. 93, 98 (2005), quoting <u>Michigan v. Summers</u>, 452 U.S. 692, 705 (1981).  Here, the Defendant was not placed in any

physical restraints, as was the case in <u>Muehler</u>, and the minimal restrictions on the Defendant's movement do not objectively reflect a custodial setting.

Plainly, the Defendant did not initiate the contact with Merrill, but the Record is uncontested that he acquiesced in Merrill's questioning without complaint. Here, no strong arm tactics were employed, notwithstanding the Defendant's intimation that Merrill's delay in executing the Warrant, until about one (1) hour after Merrill began questioning the Defendant was a ploy to induce the Defendant's cooperation. Whether a ploy, or not, there was nothing underhanded in the execution of the Warrant. As our Court of Appeals has instructed, "Mathiason and Beheler teach us that some degree of coercion is part and parcel of the interrogation process and that the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart." <u>United States v. LeBrun</u>, 363 F.3d 715, 721 (8th Cir. 2004), citing <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977), <u>California v. Beheler</u>, 463 U.S. 1121 (1983), and <u>Stansbury v. California</u>, 511 U.S. 318, 324-25 (1994). Here, there is no evidence that the Defendant could not have terminated the interview at any point, nor any suggestion that he attempted to do so, and was denied that opportunity.

The Defendant does contend that the presence of so many officers, during the conduct of the search, created a police-dominated atmosphere, but the reality is that the Defendant was questioned by Merrill, alone.  In <u>United States v. Axsom</u>, supra at 502, our Court of Appeals confronted the same issue when nine (9) officers participated in the conduct of a search, but only two (2) were involved in questioning the Defendant.   There, the Court concluded that the District Court had erred in concluding that the atmosphere was police dominated.  Here, Merrill testified, without contradiction from the Defendant, that his exchange with the Defendant was pleasant and cordial.  Accordingly, we also conclude that the presence of the searching officers did not render the atmosphere of the Defendant's questioning police-dominated.

Lastly, the Record demonstrates that, at the conclusion of the questioning, the Defendant was not arrested, and was afforded the opportunity to review the Affidavit which Merrill prepared, and that summarized the statements taken from the Defendant.   While the Defendant requested, and was granted, the opportunity to correct two (2) portions of the statement, he did not challenge the correctness of the representation, contained at the close of the Affidavit, that "[n]o threats or promises have been made to obtain this statement."  See, <u>Government Exhibit 1</u>, at p. 3 of 3. Viewing the evidence in totality, we find and conclude that a reasonable person would

not have felt that "he or she was not at liberty to terminate the interrogation and leave." United States v. Martin, 369 F.3d 1046, 1056 (8th Cir. 2004), quoting United States v. LeBrun, supra at 720, quoting in turn, Thompson v. Keohane, 516 U.S. 99, 112 (1995).   Accordingly, we find no error in Merrill's failure to provide the Defendant with a Miranda warning during the interview of September 19, 2005, as the Defendant was not in custody.

We also find that the Defendant's statements, during the interview of September 19, 2005, were voluntarily made.  Notably, the Record is devoid of any evidence that Merrill made any threats or promises to the Defendant, or used any coercive tactics during the questioning.  Similarly, no suggestion has been made that the Defendant failed to understand the nature of the interview, or the questions asked, or that his responses were inappropriate in any way.  Rather, Merrill's uncontradicted testimony reflects that Defendant appeared to understand the circumstances of the interview, and the Defendant acknowledged, in his written statement, that the answers he had given to Merrill, were made "freely" and "voluntarily," and that "no threats or promises" were made to obtain the statement.  Government Exhibit 1, at pp. 1 of 3, and 3 of 3. Further, the Defendant's written statement explicitly affirms that he had "cooperated with this investigation * * *and take full responsibility for my actions."  Id. at 2 of 3.

We find that, under the totality of the circumstances, the Defendant's statements, during the Interview of September 19, 2005, were entirely voluntary, and therefore, the Defendant's Motion to Suppress those statements should be denied.

      b.    <u>The Interview of December 8, 2005</u>.  As noted, the Defendant was interviewed a second time, on December 8, 2005, also in the familiar confines of his home, and by a single questioner -- Merrill -- who was again dressed in casual attire. As was the case on September 19, 2005, the Defendant voluntarily agreed to answer Merrill's questions, and invited him into his own home for that purpose.  The interview lasted approximately one-half an hour, and ended immediately upon the Defendant's statement that he had obtained a lawyer, and did not want to answer any more questions.  The Defendant was also not arrested at the end of that Interview, nor was his freedom of movement curtailed in any meaningful way.  Accordingly, we find no basis upon which to conclude that the second interview was custodial in nature, as no reasonable person, when confronting the same circumstances, would have concluded that he or she was under arrest, or that his or her freedom of movement was restrained in a degree that is associated with a formal arrest.  See, <u>California v. Beheler</u>, supra at 1125.

Moreover, under the "totality of the circumstances," we also find that the Defendant's statement, on December 8, 2005, was voluntarily given. Merrill told the Defendant that he had returned in order to allow the Defendant to clarify his previous statement which conflicted with that of Nelson, and with other aspects of the officer's investigation. Having thus been forewarned, the Defendant did not ask Merrill to leave, or to refrain from making inquiries; rather, the Defendant invited Merrill into his home office, where he sat down to talk with Merrill further. There is no evidence that anything Merrill said could be objectively construed as either "threats" or "promises" such as would reasonably create a coercive environment. See, Dickerson v. United States, supra at 434. Notably, the interview was conducted in a room in the Defendant's own home; no firearms or handcuffs were visible to the Defendant; and no threats or promises were made during the Interview.

In questioning the Defendant, Merrill did not raise his voice, and there has been no suggestion that he employed any methods of physical or psychological intimidation. The Defendant acknowledged to Merrill that he had not told the whole truth on September 19, 2005, and then voluntarily terminated the Interview by informing Merrill that he had spoken with an attorney, who advised him not to answer any questions. The interview promptly terminated. In sum, based upon the totality

of the circumstances, we find that the Defendant's statements, during the interview of December 8, 2005, were knowing and voluntary, and should not be suppressed.

Given the foregoing, and since we find that each of the Defendant's statements were voluntary, and were not otherwise obtained in violation of the protections set forth in Miranda v. Arizona, supra, we recommend that the Defendant's Motion to Suppress All Statements be denied.

NOW, THEREFORE, It  is –

RECOMMENDED:

That the Defendant's Motion to Suppress All Statements [Docket No. 15] be denied.

Dated:  September 25, 2006                           s/Raymond L. Erickson
                                                                 Raymond L. Erickson
                                                                 CHIEF U.S. MAGISTRATE JUDGE

### NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by**

**no later than October 13, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than October 13, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.